FILED
COURT OF APPEALS
DIVISION II

2014 DEC 16 AM 8: 32

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

In re the Detention of:

CHARLES ROBINSON,

               Respondent.

No. 44575-1-II

UNPUBLISHED OPINION

      BJORGEN, A.C.J. — Charles Robinson appeals a trial court order involuntarily committing him as a sexually violent predator (SVP) pursuant to chapter 71.09 RCW, Washington's sexually violent predator act (the Act). Robinson claims that the trial court committed constitutional or evidentiary error by allowing the State to introduce his testimony through a video deposition. Robinson also contends that the trial court erred by making numerous factual findings unsupported by the record and by concluding that he is an SVP. We reject Robinson's claims and affirm the findings of fact, conclusions of law, and the order of commitment.

## FACTS

      In 1987, while Robinson lived in California, Robinson's parents introduced him to friends of theirs, a family with a young boy named AM.[1] AM's family invited Robinson to attend church with them, and he ultimately became the leader of AM's bible study group. Robinson also babysat AM. One night, while watching six-year-old AM overnight in the church, Robinson sexually molested him multiple times. California charged Robinson with three counts

---

[1] We use initials to identify minor victims of sexual assault.

of lewd and lascivious acts with a child under age 14, and Robinson pleaded guilty to a single count, receiving a six-year prison sentence.

Robinson served approximately four years of his sentence before the State paroled him to the community. Two of the terms of Robinson's parole forbade contact with minors or involvement in youth groups. Robinson's inability to comply with these terms resulted in three parole violations.

Robinson's first violation occurred when his parole officer paid him a home visit to investigate allegations that Robinson had contacted minor children. Robinson admitted to having taken a seven-year-old boy into his bathroom, but denied that anything sexual had occurred. Robinson also admitted to playing and wrestling with some of the neighborhood children, but again denied any inappropriate contact. A search of Robinson's home disclosed numerous knives, which the terms of Robinson's parole prohibited him from possessing. Robinson served a year in prison for these violations of the conditions of his parole.

Shortly after his release, Robinson's new parole officer searched his residence because of concerns about his behavior. The parole officer found children's interest magazines, a Sunday school flyer, children's underwear, children's toys, and badges from a youth organization in Robinson's possessions. Robinson showed up in the company of two very young girls during this search. Robinson's parole officer took him into custody for violating the conditions of his parole, and he served another year in prison.

Less than three months after his release, Robinson's parole officer chanced across him walking down the street, holding hands with the same two girls the parole officer saw with him when she searched his residence. Robinson stated that he was babysitting the two girls and that

he had done so on several occasions. Robinson's parole officer again took him into custody, and he remained incarcerated until his term of parole expired.

After his release, Robinson moved to Washington State, where he worked as a maintenance man at an apartment complex. Robinson met a woman and her young child, WB, when he showed them an apartment in the complex. Robinson befriended the two, giving them things he found abandoned in the complex's storage units. Eventually Robinson offered to babysit WB, and WB's mother agreed to Robinson's offer.

WB alleged that Robinson had touched him inappropriately while babysitting. An investigation into these allegations disclosed several other children at the apartment complex who also claimed that Robinson molested them, including a three-year-old boy, a four-year-old girl, a five-year-old boy, and a six-year-old girl. Although he would later deny making the statement at his SVP commitment proceeding, Robinson told the investigating officers that he was unable to control his sexual urges related to young children.[2]

The State charged Robinson with first degree child molestation for the inappropriate contact with WB. After a trial, the jury returned a guilty verdict, and the trial court found that Robinson had used a position of trust to facilitate the commission of a crime involving a vulnerable victim. The trial court used these findings to impose an exceptional sentence of life in prison on Robinson, although Robinson ultimately received only 89 months after a successful appeal.

---

[2] The State introduced Robinson's statement through the testimony of its expert psychologists, who learned of the statements through Robinson's medical and criminal files. The State's trial brief indicated that it would introduce this testimony as substantive evidence, and Robinson did not object on hearsay grounds at trial.

In 2007, prior to Robinson's scheduled release, the State filed a petition alleging that he was an SVP and seeking his commitment pursuant to the Act. A court found that there was probable cause to believe Robinson was an SVP, and a contested bench trial on Robinson's commitment ensued.

Proving that Robinson was an SVP required the State to show, beyond a reasonable doubt, that he "ha[d] been convicted of or charged with a crime of sexual violence and . . . suffer[ed] from a mental abnormality or personality disorder which ma[de] [him] likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). For purposes of the Act, a mental abnormality is "a congenital or acquired condition affecting the emotional or volitional capacity which predisposes the [potentially committed person] to the commission of criminal sexual acts in a degree constituting such person a menace to the health and safety of others." RCW 71.09.020(8).

To show that Robinson had been charged with, or convicted of, a crime of sexual violence, the State offered the documents used to charge Robinson with molesting AM and WB, Robinson's guilty plea for the charges involving AM, and the felony judgment and sentence resulting from the jury's verdict that he molested WB.

To show that Robinson suffered from a congenital or acquired condition, the State offered Robinson's testimony admitting to molesting AM, the guilty plea for molesting AM, the judgment and sentence for molesting WB, and testimony that Robinson had molested other children at the apartment complex. The State also offered Robinson's video deposition testimony. The State's experts, Drs. Ronald Page and Harry Goldberg, opined, based on this evidence and their reviews of his medical and police records, that Robinson suffered from

4

pedophilia and that this pedophilia was a chronic condition that he suffered from at the time of the commitment proceedings.

The State also offered the evidence about Robinson's molestation of children and his parole violations to show that Robinson's pedophilia affected his emotional or volitional capacity, predisposing him to the commission of criminal sexual acts in a degree making him a menace to the health and safety of others. Goldberg testified, based on this evidence, that Robinson's pedophilia impaired his volitional capacity and predisposed him to committing crimes of sexual violence against young children.[3] Page concurred.

Finally, to show that Robinson was likely to engage in predatory acts of sexual violence if not confined in a secure facility, Goldberg opined, based on his interview with Robinson, review of Robinson's police and medical files, and use of six actuarial risk assessment tools, that Robinson was more likely than not to commit acts of predatory sexual violence unless confined in a secure facility.[4] Again, Page concurred, testifying that, based on his interview with Robinson and review of Robinson's police and medical records, he believed that Robinson would commit predatory acts of pedophilia unless committed as an SVP.

Goldberg and Page specifically rejected some of the arguments Robinson would later advance to show he was not an SVP. First, Goldberg disagreed that Robinson's advancing age would reduce his risk of committing predatory sexual violence below that necessary for

---

[3] Both Page and Goldberg also diagnosed Robinson with other afflictions not relevant to this appeal.

[4] Goldberg used the Static-99R, the Static-2002R, the MnSOST-R, the SORAG, the HARE PCL-R, and the SRA:FV risk assessment tools.

5

commitment. Goldberg noted that the actuarial instruments already accounted for Robinson's age, meaning that in spite of any decreased libido associated with aging, the risk assessments still indicated that he remained likely to commit acts of predatory sexual violence unless committed. Second, both Page and Goldberg testified that Robinson's lack of pedophilic behavior during his incarceration for molesting WB did not mean that he no longer had a mental abnormality. Indeed, both opined that Robinson suffered from pedophilia and diminished volitional control at the time of the commitment proceeding.

In defense, Robinson offered the testimony of Dr. James Manley. Manley agreed that Robinson suffered from pedophilia.[5] However, in contrast to Page and Goldberg, Manley opined that Robinson's pedophilia did not constitute a mental abnormality and did not make him likely to reoffend unless confined. Manley contended that finding a mental abnormality required a recent indication of decreased volitional control. Manley opined that Robinson had shown volitional control, because no evidence indicated that he had committed crimes of sexual violence while on parole or that he had engaged in pedophilic behavior during his incarceration for abusing WB. Manley also testified that the "urges and behaviors" associated with pedophilia "tend to mitigate with age or decrease" and that Robinson's age meant that he had essentially aged out of dangerousness. Verbatim Report of Proceedings VRP (Trial) at 325.

Manley disputed Goldberg's finding that Robinson was more likely than not to reoffend unless confined, relying on his scoring of Robinson on two risk assessment tools. Under cross-examination, Manley admitted to mistakenly underscoring Robinson on both of these risk

---

[5] Like Page and Goldberg, Manley also diagnosed Robinson with a secondary condition not relevant to this appeal.

assessment tools, but he adhered to his conclusion that Robinson did not pose a sufficient risk of committing further acts of predatory violence to warrant commitment under the Act.

The trial court found the testimony of Goldberg and Page to be credible. The trial court also found that the State had proven beyond a reasonable doubt that Robinson had committed a crime of sexual violence, suffered from a mental abnormality and a personality disorder, and was more likely than not to commit further acts of predatory sexual violence unless confined in a secure facility. Consequently, the trial court concluded Robinson was an SVP and ordered his commitment.

Robinson appeals.

## ANALYSIS

Robinson challenges his SVP commitment on two grounds. First, he contends that, by allowing the State to admit his video deposition testimony in the SVP proceeding, the trial court violated his right to remain silent and the evidentiary rules requiring live witness testimony. Robinson also contends that the evidence presented at trial was insufficient to support many of the trial court's findings of fact or its order of commitment. We affirm.

### I. RIGHT TO SILENCE

Robinson contends that the trial court erred by allowing the State to introduce his video deposition, because his right to remain silent entitled him to refuse to answer any questions. Robinson claims that the right to remain silent applies in SVP commitment proceedings through either the self-incrimination clause of the Fifth Amendment or the due process clause of the Fourteenth Amendment to the United States Constitution. Because Robinson's claim involves a

constitutional right, we review it de novo. *State v. Dobbs*, 180 Wn.2d 1, 10, 320 P.3d 705 (2014). We find no error.

A.    The Fifth Amendment

Robinson first argues that he had a right to remain silent because SVP commitment proceedings are essentially criminal proceedings, triggering the protections of the Fifth Amendment. We disagree.

The self-incrimination clause of the Fifth Amendment to the United States Constitution provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. By its terms, the right to remain silent found in the Fifth Amendment applies in criminal proceedings, although courts have held that this right also applies in any civil matter where "the penalty imposed is punishment tantamount to a criminal sanction." *In re Pers. Restraint of Young*, 122 Wn.2d 1, 51, 857 P.2d 989 (1993). Our Supreme Court has determined that the right to remain silent does not apply in SVP commitment proceedings because such proceedings are civil proceedings that do not impose "punishment tantamount to a criminal sanction" on a person committed as an SVP. *Young*, 122 Wn.2d at 18-23, 50-52, 59.

Despite *Young*'s contrary holding, Robinson contends that the right to remain silent applies to SVP commitment proceedings because chapter 71.09 RCW "'is so punitive either in purpose or effect'" as to "establish[] criminal proceedings for constitutional purposes." *Kansas v. Hendricks*, 521 U.S. 346, 361, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997) (quoting *United States v. Ward*, 448 U.S. 242, 248-49, 100 S. Ct. 2636, 65 L. Ed. 2d 742 (1980)) (first alteration in original). We find his contentions unpersuasive.

8

First, Robinson argues that because SVP commitment proceedings use some of the procedural safeguards the constitution imposes on criminal proceedings, SVP commitment proceedings are criminal in nature. This argument, however, was rebuffed in *Hendricks*, 521 U.S. at 364-65 and *Allen v. Illinois*, 478 U.S. 364, 371-72, 106 S. Ct. 2988, 92 L. Ed. 2d 296 (1986), which reasoned that the use of some constitutional protections required in criminal trials in SVP commitment proceedings does not transform such proceedings into criminal ones.

Second, Robinson contends that the Act is criminal because it allows the State to detain the potentially committed person during commitment proceedings. The *Young* court held that the restraints on liberty permitted by the Act served civil purposes and thus did not transform it into a penal statute. *Young*, 122 Wn.2d at 21-23. As Robinson's potential detention before and during trial are part of these restraints on liberty, his argument must fail.

Third, Robinson maintains that the Act is punitive in purpose and effect because the State may only file a petition against a person who has committed a crime of sexual violence. The fact that the legislature does not "apply [chapter 71.09 RCW] to the larger class of mentally ill persons who might be found sexually dangerous does not somehow transform a civil proceeding into a criminal one." *Allen*, 478 U.S. at 370. Requiring the State to prove a prior crime of sexual violence is required, "not to punish past misdeeds, but primarily to show the [potentially committed person's] mental condition and to predict future behavior" consistent with the requirements of due process. *Allen*, 478 U.S. at 371. Therefore, limiting SVP commitment proceedings to those convicted of criminal sexual violence does not make the SVP proceeding criminal in nature.

Fourth, Robinson claims that the long-term detention and treatment permitted by the Act distinguishes it from similar acts deemed civil in nature. The Act, however, requires the release of committed persons "as soon as they are no longer dangerous." *Young*, 122 Wn.2d at 20-21. Indeed, chapter 71.09 RCW allows an individual to petition for release at any time and requires annual reviews. RCW 71.09.090. These provisions link the restraint of a committed person's liberty with the civil purposes of chapter 71.09 RCW, treatment and incapacitation, and show that any restraints are not punitive in nature. *Hendricks*, 521 U.S. at 364.

Finally, Robinson contends that the legislature has allowed for the assertion of Fifth Amendment rights in other involuntary commitment proceedings and appears to argue that this makes all involuntary commitment proceedings criminal. Robinson did not raise this argument in his opening brief and, therefore, waived it.[6] *Ives v. Ramsden*, 142 Wn. App. 369, 396, 174 P.3d 1231 (2008).

We reject Robinson's contention that the Act is so punitive in purpose or effect as to become a criminal statute. As such, the Fifth Amendment, by its own terms, is inapplicable to Robinson's commitment proceedings, and he had no right to remain silent. *Young*, 122 Wn.2d at 51.

---

[6] Even if we reached the merits of Robinson's claim, we would reject it. As noted, the legislature may, by statute, provide for constitutional protections in proceedings where not constitutionally required. This does not, however, transform those proceedings into criminal matters. *Hendricks*, 521 U.S. at 364-65. Robinson's contention here is actually an equal protection claim. *See In re Det. Of Thorell*, 149 Wn.2d 724, 745-55, 72 P.3d 708 (2003). Our Supreme Court has already concluded the legislature had a rational basis to distinguish between other involuntary commitment proceedings and those pursuant to the Act for purposes of the right to silence. *Young*, 122 Wn.2d at 51-52. Accordingly, there is no equal protection violation. *See Thorell*, 149 Wn.2d at 751.

B.     The Fourteenth Amendment

Robinson also contends that the balancing test used to determine whether due process requires a procedural safeguard before the deprivation of a protected interest requires allowing the assertion of the right to remain silent in SVP proceedings.[7] *See Mathews v. Eldridge*, 424 U.S. 319, 96 S. Ct. 893, 47 L. Ed. 2d 18 (1976). Again, we disagree.

The United States Supreme Court has already determined that the due process clause does not import the right to silence into SVP commitment proceedings. *Allen*, 478 U.S. at 374-75. The Supreme Court reasoned that *Mathews* and its balancing test only apply to procedural safeguards intended to ensure the reliability of deprivation proceedings. *Allen*, 478 U.S. at 374-75. The right to remain silent exists because of notions about the nature of the Anglo-American system of justice, not because it ensures the reliability of confessional statements. *Allen*, 478 U.S. at 375 (quoting *Rogers v. Richmond*, 365 U.S. 534, 540-41, 81 S. Ct. 735, 5 L. Ed. 2d 760 (1961)). The right to remain silent, therefore, "has no place among the procedural safeguards discussed in *Mathews v. Eldridge*," and Robinson's due process argument lacks merit. *Allen*, 478 U.S. at 375.

## II. Deposition Testimony

Robinson next alleges that, if the State could compel his testimony, it needed to do so by calling him to the witness stand rather than playing his video deposition. We hold that Robinson waived this challenge and decline to reach its merits.

---

[7] The due process clause provides that "[n]o state shall . . . deprive any person of life, liberty, or property without due process of law." U.S. Const. amend. XIV, § 1.

Generally, we will not review claims of errors made for the first time on appeal. RAP 2.5(a). More specifically, a litigant may not assign error to an evidentiary ruling on a basis not raised at trial. *State v. Powell*, 166 Wn.2d 73, 82, 206 P.3d 321 (2009). Requiring litigants to raise possible errors in the trial court allows for their contemporaneous correction, obviating the need for a retrial and serving important goals of judicial economy and fairness. *Powell*, 166 Wn.2d at 82.

Robinson's attorney made a general objection to the State's attempt to admit his video deposition testimony. However, when the State cited court rules allowing the deposition's admission, the trial court asked Robinson's counsel whether there "[wa]s . . . any basis under the rule or any other authority that makes presentation and publication or admission of the deposition inappropriate?" VRP (Trial) at 37. Robinson's counsel replied, "No." VRP (Trial) at 37. Under *Powell*, 166 Wn.2d at 82, Robinson waived his claim.[8]

### III. FINDINGS OF FACT

Robinson next assigns error to 29 of the trial court's findings of fact. We find no merit in his arguments, with one exception having no effect on our disposition of Robinson's appeal. We therefore affirm the trial court's findings.

We review a trial court's factual findings for substantial supporting evidence in the record. *In re Det. Of Kistenmacher*, 134 Wn. App. 72, 75, 138 P.3d 648 (2006). Substantial evidence is evidence sufficient "'to persuade a rational fair-minded person the premise is true.'"

---

[8] Again, even if we reached the merits of this claim, we would reject it. The civil rules govern SVP commitment proceedings. *In re Det. of Williams*, 147 Wn.2d 476, 488, 55 P.3d 597 (2002). The State's use of Robinson's deposition testimony is fully consistent with ER 801(d)(2) and CrR 32(a)(2); *see Young v. Liddington*, 50 Wn.2d 78, 79-80, 309 P.2d 761 (1957) (permissible to use deposition of party opponent as substantive evidence during a litigant's case-in-chief).

*Kistenmacher*, 134 Wn. App. at 75. We defer to the fact finder's determinations about witness credibility and the persuasiveness of the evidence, as well as its resolution of conflicting testimony. *State v. Mashek*, 177 Wn. App. 749, 756, 312 P.3d 774 (2013) (quoting *State v. Liden*, 138 Wn. App. 110, 117, 156 P.3d 259 (2007)).

A.    Findings of Fact 4, 5, 15, 33, and 43

Robinson first contends that the trial court erred in finding that he placed himself in positions of trust in order to groom his victims. Robinson contends that he only babysat when asked to do so and that no evidence at trial showed any grooming.

Robinson's own testimony, along with the opinion testimony of Page and Goldberg, provides substantial evidence to support these findings of fact. Robinson testified that AM's family asked him to babysit for them, indicating that he occupied a position of trust. Robinson testified that he volunteered to babysit WB, an offer that WB's mother accepted, again indicating that he occupied a position of trust. Robinson had attained these positions of trust by accompanying AM's family to church and becoming a youth group leader and by giving WB's mother items she needed for her apartment. Page and Goldberg both opined that these activities were Robinson's attempts to gain the trust of AM's and WB's parents to get access to the children. Goldberg also testified that, in his opinion, Robinson wanted access to children in order to groom them. Thus, substantial evidence supports the trial court's finding that Robinson placed himself in positions of trust in order to groom his victims.

B.    Finding of Fact 13

Robinson next challenges the trial court's finding that, based on his two convictions for child molestation offenses, he "has an ongoing and recurring interest in children that qualifies

13

him as a pedophile." Clerk's Papers (CP) at 600. Robinson contends this is a conclusion of law or, alternatively, no evidence supports a finding he is a pedophile.[9]

The record contains substantial supporting evidence for the trial court's finding that Robinson is a pedophile. Each of the expert psychologists, Page and Goldberg for the State and Manley for Robinson, testified that, based on the evidence, Robinson met the clinical definition of a pedophile.

C.    Finding of Fact 16

Robinson next challenges the trial court's finding that "Dr. Page opined and felt strongly that [he] posed a high risk to re-offend." CP at 601. Robinson's challenge to this finding is puzzling. Page testified to exactly what the trial court found. Robinson appears to challenge the finding because Page did not need to offer this opinion when evaluating Robinson. That is irrelevant. The fact that Page did so provides substantial evidence supporting the trial court's finding.

D.    Finding of Fact 23

Robinson next challenges the trial court's finding that there were allegations that Robinson molested a "three-year-old girl" and harassed a twelve-year-old boy. CP at 602-03. As Robinson notes, the testimony indicated there were allegations of molestation involving a three-year-old boy, not a girl. Nonetheless, the trial testimony provided substantial evidence for the substance of the trial court's finding that there were allegations involving a three-year-old

---

[9] It is a finding of fact. Whether Robinson suffers from pedophilia is a factual issue relevant to a legal determination that he is a SVP.

child. Robinson's challenge to the portion of the finding related to the twelve-year-old boy is without merit as both he and Goldberg testified to the substance of the trial court's finding.

E.    Findings of Fact 26, 27, and 31

In his challenge to finding 28, discussed below, Robinson argues that the court erred in adopting findings of fact 26, 27, and 31, which summarized Goldberg's testimony that Robinson had a mental abnormality and a personality disorder. Robinson did not assign error to these findings and makes no argument as to how the record does not substantiate them, other than he presented contrary testimony from Manley. Robinson waived his claim of error. *State v. Olson*, 126 Wn.2d 315, 321, 893 P.2d 629 (1995).[10]

F.    Findings of Fact 28, 29, 30, 33, 48, 49, 50, and 51

Robinson also challenges the trial court's findings that he showed impaired volitional control. Robinson contends that Manley testified that he had volitional control based on his time in the community without any sex offenses and his lack of pedophilic behavior during his incarceration for molesting WB.

Substantial evidence supports the trial court's findings that Robinson had impaired volitional control. This evidence includes Robinson's two criminal convictions, three parole violations for contact with children despite express prohibitions against doing so, Goldberg's and Page's opinions that he sought out access to children in spite of the penalties for doing so and that Robinson's pedophilia impaired his volitional control, and Robinson's own statements that he could not control his urges.

---

[10] Regardless, given that the findings summarize Goldberg's testimony, substantial evidence supports them and we defer to the trial court's resolution of any conflict between Goldberg's and Manley's testimony.

Further, Goldberg and Page testified that Robinson's lack of pedophilic behavior during his incarceration did not show his volitional control was unimpaired. While Manley testified in a contrary manner, the trial court explicitly found Goldberg's testimony credible. We defer to the trial court's resolution of conflicting testimony. Thus, substantial evidence supports the trial court's finding that Robinson had impaired volitional control.

G.    Finding of Fact 31

Robinson next challenges the trial court's finding that he "has not resolved his sexual urges and his fantasies" concerning children and that he would commit new acts of pedophilia if released, given his lack of treatment. CP at 605. Robinson claims that no evidence suggests he would molest children as he has been offense free for 13 years and that any lack of treatment is not his fault.

Substantial evidence supports the trial court's finding. Goldberg testified that, based on the results from the risk assessment screening he performed on Robinson, he believed Robinson was more likely than not to commit predatory sexual violence if released. Page concurred on the basis of his interview with Robinson and review of Robinson's records. Indeed, Page essentially testified to the wording of the trial court's finding. Any fault for lack of treatment is irrelevant to the trial court's finding, which is supported by Goldberg's testimony about the effect of Robinson's lack of treatment. Finally, both Page and Goldberg testified that Robinson continued to suffer from pedophilia at the time of the commitment proceedings, indicating that he had not resolved his pedophilia. Substantial evidence supports this finding.

16

H.    Findings of Fact 34-37

Robinson next challenges the trial court's findings related to Goldberg's diagnosis that Robinson was a pedophile and Goldberg's use of various risk assessments to determine Robinson was more likely that not to engage in predatory sexual violence unless committed. Goldberg testified to the substance of each of those findings, and substantial evidence therefore supports them. Page concurred that Robinson would commit further acts of predatory sexual violence unless confined. The trial court found Goldberg's and Page's testimony credible. Thus, Robinson's argument that Manley testified in a contrary manner is irrelevant, since we defer to the trial court's resolution of conflicting testimony. Robinson's challenge fails.

I.    Finding of Fact 40

Robinson next challenges the trial court's finding related to Goldberg's use of the SRA:FV (Structured Risk Assessment: Forensic Version) risk assessment tool. Robinson argues that the testimony about the instrument was inadmissible as the instrument has not satisfied the general acceptance and reliability requirements of *Frye v. United States*, 293 F. 1013 (D.C. Cir. 1923), which governs novel scientific testimony. However, as the State argues, Robinson did not raise his *Frye* challenge with the trial court and has therefore waived it. *In re Det. of Post*, 145 Wn. App. 728, 755-56, 187 P.3d 803 (2008); *In re Det. of Taylor*, 132 Wn. App. 827, 836, 134 P.3d 254 (2006).

J.    Findings of Fact 41 and 47

Robinson challenges these findings by contending that the trial court erred in discounting the effect his age would have on the likelihood he would commit further sexual offenses if released.

17

Substantial evidence supports the trial court's findings. Goldberg testified that the Static-99R risk assessment tool already accounted for Robinson's age when determining whether he was more likely than not to reoffend. Goldberg testified that, as a result, further consideration of Robinson's age would double credit Robinson with any decrease in likelihood of recidivism, introducing error into the relevant calculations. While Robinson cites Manley's contrary testimony, we defer to the trial court's resolution of Goldberg's and Manley's conflicting testimony. Thus, Robinson's contention fails.

K.     Finding of Fact 42

In challenging this finding, Robinson contends that the trial court erred in discounting the effect his plans to go work in the construction industry in California would have on the likelihood he would reoffend.

Substantial evidence supports the trial court's finding. Goldberg testified that Robinson had no realistic plans to find work: he had not been in the work force in California in decades and had no contacts there. Goldberg testified further that Robinson's plans to return to California would increase, rather than decrease his likelihood of committing further predatory sexual violence. Again, Robinson cites Manley's conflicting testimony, but we defer to the trial court's resolution of the conflict between Goldberg's and Manley's testimony. Accordingly, Robinson's contention fails.

L.     Finding of Fact 43

Robinson also claims that the trial court erred in finding that his past sexual misconduct was predatory. Since Page testified to exactly that, substantial evidence supports the trial court's finding.

M.    <u>Finding of Fact 52</u>

Finally, Robinson challenges the trial court's finding that he exhibited denial during his testimony. Robinson claims that he "volunteered considerable information" about his offenses. Br. of Appellant at 50.

Substantial evidence supports the trial court's finding. Page and Goldberg both testified about Robinson's denial. With regard to Robinson's own testimony, he repeatedly either provided minimal answers, attempted to avoid answering questions about molesting AM or WB, or attempted to move the testimony on to other issues.

## IV. ORDER OF COMMITMENT

Robinson next argues that the trial court erred in concluding he was an SVP. Specifically, Robinson contends that the trial court ignored (1) evidence of his volitional control and (2) the State's failure to present recent evidence of impaired volitional control because he did not show pedophilic behavior during his incarceration for molesting WB. We disagree.

To commit Robinson as an SVP, the State needed to prove (1) he had been convicted of, or charged with, a crime of sexual violence as defined in RCW 71.09.020(17) and that (2) he suffered from "a mental abnormality or personality disorder," which (3) made him "likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18). Proving that Robinson had a "mental abnormality" required the State to show that Robinson had "a congenital or acquired condition affecting" his "emotional or volitional capacity" predisposing him "to the commission of criminal sexual acts in a degree constituting [him] a menace to the health and safety of others." RCW 71.09.020(8). Proof of these elements shows the potentially committed person poses a current threat to public safety and ensures that

the State commits only dangerous mentally ill individuals, rather than allowing for the commitment of "typical criminal recidivist[s]." *In re Det. of Thorell*, 149 Wn.2d 724, 736, 72 P.3d 708 (2003).

We review a challenge to the sufficiency of the evidence supporting a trial court's determination that a person is an SVP using the criminal standard of review. *Thorell*, 149 Wn.2d at 744. Under that standard, evidence is sufficient when, taken in the light most favorable to the State, a rational trier of fact could find all the elements necessary to commit the individual as an SVP beyond a reasonable doubt. *Thorell*, 149 Wn.2d at 744; RCW 71.09.060(1). A committed person challenging the sufficiency of the evidence supporting a determination that they are an SVP admits the truth of all of the State's evidence and all reasonable inferences that can be drawn therefrom. *State v. O'Neal*, 159 Wn.2d 500, 505, 150 P.3d 1121 (2007).

Robinson first claims that the State failed to show beyond a reasonable doubt that he had a mental abnormality as required by RCW 71.09.020(17), because he showed volitional control by not molesting any children during his parole. Robinson appears to ask us to hold that the State must show beyond a reasonable doubt that he can *never* control his behavior to prove a mental abnormality. Neither Washington's commitment scheme nor due process requires the State to carry such a burden of proof in SVP commitment proceedings. RCW 71.09.020(8) (proof of a mental abnormality only requires showing impairment of volitional capacity, not its elimination); *Kansas v. Crane*, 534 U.S. 407, 411-12, 122 S. Ct. 867, 151 L. Ed. 2d 856 (2002) (due process does not require the State to show a complete inability to control behavior for SVP commitment).

20

We hold that the State introduced evidence that would have allowed a rational trier of fact to conclude beyond a reasonable doubt that Robinson suffered from impaired volitional control. Robinson's pedophilia caused him to molest at least two young children, resulting in lengthy prison incarcerations. Regardless of whether Robinson correctly claims that he did not molest any children during his parole, his pedophilia drove him to make contact with children in violation of his parole, resulting in his incarceration on three separate occasions. Further, Robinson told the officer investigating the molestation of WB that he could not control his urges toward children. Based on this evidence, Page and Goldberg testified that Robinson's pedophilia impaired his volitional control. While Manley offered contrary testimony, the trial court found Page and Goldberg's testimony to be credible, and we defer to the trial court's resolution of the conflicting testimony.

Robinson next contends that the State failed to show volitional impairment during his incarceration for molesting WB. Robinson appears to contend that the State failed to show recent evidence of his inability to control his behavior and therefore failed to show he was currently dangerous at the time of the SVP commitment proceeding. *See In re Det. of Albrecht*, 147 Wn.2d 1, 7, 51 P.3d 73 (2002) ("[t]he dangerousness must be current.").

Dangerousness within the meaning of SVP commitment arises from a condition affecting the potentially committed person's volitional capacity, predisposing him or her to future predatory sexual violence. RCW 71.09.020(8), (18); *Thorell*, 149 Wn.2d at 736. The record contains sufficient evidence to allow a rational trier of fact to conclude beyond a reasonable doubt that the State proved Robinson's current dangerousness at the time of his commitment proceedings. Page and Goldberg testified that Robinson suffered from pedophilia at the time of

21

the commitment proceeding. Page and Goldberg also testified that Robinson's pedophilia decreased his volitional control such that, in their opinion, Robinson would likely commit future acts of predatory sexual violence if not confined. Goldberg specifically rejected the argument that Robinson makes here, namely that the absence of pedophilic behavior during his incarceration for molesting WB shows his volitional control, and, thus, that he is no longer dangerous. Again, while Manley offered contrary testimony, we defer to the trial court's resolution of the conflicting testimony on this issue. Robinson's contention fails.

## CONCLUSION

We affirm the trial court's findings of fact, conclusions of law, and order committing Robinson as a SVP.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record pursuant to RCW 2.06.040, it is so ordered.

BJORGEN, A.C.J.

We concur:

MAXA, J.

LEE, J.