IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| STATE OF WASHINGTON, | ) | |
| | ) | No. 38437-3-III |
| Respondent, | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| RICHARD CARL HOWARD II, | ) | UNPUBLISHED OPINION |
| | ) | |
| Appellant. | ) | |

STAAB, J. — Richard Howard appeals from his conviction of second degree assault—domestic violence. On appeal, he argues: (1) the trial court violated his right to a speedy trial under CrR 3.3, (2) the trial court abused its discretion in admitting the expert witness testimony of a sexual assault nurse examiner, (3) the trial court abused its discretion in admitting hearsay under the excited utterance, present sense impression, and medical diagnosis hearsay exceptions, and (4) the State committed misconduct by vouching for witness credibility in its closing argument. In his statement of additional grounds, Howard raises several issues, including whether the lack of ethnic diversity in the jury venire violated his right to a jury of his peers. Finding no error, we affirm.

BACKGROUND

Donald Richardson was talking on the phone with Dusti Jones when she suddenly began screaming and the phone went dead. Richardson immediately called 911. While Richardson was still on the phone with 911, he found Jones who was holding her sides and crying. After Jones got into Richardson's vehicle, Richardson relayed questions and answers between the 911 operator and Jones.

Jones and Richardson then met up with Officer Ethan Wilke. Officer Wilke's body camera recorded the contact. Jones told Officer Wilke that she had been attacked and strangled by Howard, her estranged husband. She also explained that there was a dispute between her and Howard regarding a vehicle and Howard had driven off with her truck. She later reported to a doctor that Howard had tackled her from behind, body slammed her, and strangled her.

Police arrested Howard the next day. The State charged Howard with second degree assault domestic violence and harassment domestic violence. Howard was arraigned on February 9, 2021, and his trial commenced on September 1.

1. PRE-TRIAL MOTIONS[1]

Prior to trial, the State moved to admit several hearsay statements. It appears from the record that the State was not sure if Jones would be testifying, so the parties also

---

[1] Details of the motions and CrR 3.5 hearing are included in the analysis section below.

2

considered the proposed evidence in light of Howard's right to confrontation under the Sixth Amendment of the United States Constitution. After the hearing, the trial court entered findings of fact and conclusions of law, concluding that several of the proposed conversations were admissible: (1) the initial 911 call from Richardson that included questions and answers to and from Jones, (2) Jones' conversation with Officer Wilke recorded on his body camera, and (3) Richardson's conversation with Officer Wilke recorded on his body camera.

2.      TRIAL

The State's first witness was a nurse who provided expert testimony regarding strangulation. The nurse testified that she was a registered nurse with thirteen years of experience and worked as a sexual assault nurse examiner (SANE). She explained that she had attended multiple strangulation trainings and had provided strangulation training for other SANEs and her coworkers. The nurse stated that she had examined patients who had been strangled and explained that visible signs of strangulation occur in only about 50 percent of cases and that bruising marks from strangulation may not appear immediately. The nurse also explained that a relatively small amount of pressure was required to stop airflow and blood flow during a strangulation.

A doctor who examined Jones following the incident testified. Reading the medical record from Jones' visit, the doctor testified that the record said, "[p]atient states that she does have some neck pain and ligature marks from her husband's hands." 1 Rep. of Proc. (RP) at 310.

Officer Wilke testified. He stated that he contacted Jones shortly after the incident. During his testimony, the trial court allowed the State to admit a portion of his bodycam footage from the interaction. Officer Wilke further testified that when he spoke with Jones, "[s]he was fairly well collected, but she did cry during the interview at times." 1 RP at 385. He also noted that she was disheveled, had sticks and leaves on her, and her clothes appeared muddy.

Officer Samuel Canty, who was present when Howard was arrested, testified. He stated that when he "made contact" with Howard prior to Howard's arrest, Howard was in a vehicle. Officer Canty also said that Howard told him that he had followed Jones on foot for a few blocks before the alleged incident.

Initially, the State advised the court that it did not anticipate calling Jones as a witness. Although Jones' name was on the State's witness list, the State had been unable to contact her or serve her with a subpoena. While the State was still in the process of presenting its case, it noticed Jones in the courtroom. The State served her with a subpoena and then informed the trial court of the situation. Howard responded by

expressing concern about Jones' seemingly random appearance and speculated that the State might have used intimidation to procure her presence. Howard also argued that allowing Jones to testify would prejudice his case and made comments suggesting that he had planned his defense around Jones not testifying. The State said that it had no idea why Jones had appeared and that it had not had contact with her since March.

When it came time for Jones to testify, she initially refused to enter the courtroom. The State presented the issue to the trial court. Howard expressed concern that requiring Jones to testify at that point would result in inaccurate and coerced testimony.

Jones ultimately entered the courtroom. She said that she wanted to invoke spousal privilege because she was married to Howard, but the trial court explained that she was required to testify. Jones then explained that she had only come to the courtroom because she thought that Howard was being sentenced.

Jones did eventually testify. She said that she did not remember much of what happened that evening. Other than asking her to identify herself in Officer Wilke's bodycam footage and asking her to confirm that she sought medical care following the incident, the State did not ask her any questions concerning the incident.

During Howard's cross-examination of Jones, he asked her questions regarding two of her responses to a domestic violence lethality assessment conducted by Officer Wilke. Howard also presented as evidence the 911 call from Jones that the trial court had previously determined was not admissible by the State. During redirect, the State

requested that Jones read her additional responses to the questions on the form. Howard objected. The trial court ruled that since Howard had opened the door by asking questions about the assessment on cross-examination, the State could bring in additional information on the assessment under the rule of completeness.

Howard elected to testify. He said that on the evening of the incident, he saw Jones walking and talking on her phone. He approached her and said, "I thought you never talked bad about me to people." 2 RP at 693. Jones yelled that it was none of his business, and Howard reached out with his left hand for Jones' phone. Jones quickly reacted to keep Howard from grabbing her phone, and they both slipped and fell to the ground.

During cross-examination of Howard, the State asked him whether Jones had reacted in a startled manner when Howard had attempted to take her phone from her because Howard had attempted to take her phone in the past. Howard objected, and the trial court overruled his objection determining that Howard's previous testimony about grabbing Jones' phone had opened the door to the evidence. The State then questioned Howard on whether he told police that he had taken Jones' phone from her previously and that is why she reacted strongly.

The trial court instructed the jury that "[a] person commits the crime of assault in the second degree when he or she assaults another by strangulation." Clerk's Papers (CP) at 271. The trial court also instructed the jury that to find Howard guilty of second degree

6

assault, it must find that the following elements have been proved beyond a reasonable

doubt:

> (1) That on or about January 30, 2021, the defendant intentionally assaulted
> Dusti Jones by strangulation; and
>
> (2) That this act occurred in the State of Washington.

CP at 272.

The instructions defined strangulation as "to compress a person's neck, thereby

obstructing the person's blood flow or ability to breathe, or doing so with the intent to

obstruct the person's blood flow or ability to breathe." CP at 274. Additionally, the jury

was instructed that a "person acts with intent or intentionally when acting with the

objective or purpose to accomplish a result that constitutes a crime." CP at 273.

During closing argument, the State argued that Jones' statements to her doctor

were credible:

> Now, a person tells their doctor the truth, ladies and gentlemen.
> When they go to the doctor, it's important to tell the doctor what really
> happened so the doctor or the medical people can provide the best possible
> treatment. That's why it's allowed to be presented to the jury, because it
> has that extra credibility that you're not going to go in and tell your doctor
> something that's inaccurate. That's why Officer—Dr. Hartley was able to
> come in and repeat what was said.

2 RP at 787-88. The State also argued that the evidence showed Howard's act was

premeditated:

7

Now we know why he did it, because he was—she was talking bad about him. He was behind her. He heard it. And then as you heard in the body camera clip, as soon as she got into that field, he attacked. That's premeditation, ladies and gentlemen, and that's your motive.

2 RP at 844.

The jury found Howard guilty of second degree assault but not guilty of harassment. It also found that Howard and Jones were intimate partners on a special verdict form.

The trial court sentenced Howard to 63 months imprisonment along with 18 months of community custody.

Howard appeals.

ANALYSIS

1.    SPEEDY TRIAL

Howard argues that the delays in his trial resulted in a violation of the CrR 3.3 time for trial rule. Specifically, he argues that the trial court granted two continuances based on judge unavailability that should be included in the speedy trial calculation. While Howard concludes that his trial began on day 92 of his speedy trial period, he fails to show his calculations or explain how he reaches this result.[2] Additionally, he fails to

---

[2] Additionally, we could not find any calculations in the trial court record. Instead, generalized findings that the time for speedy trial had not yet expired were repeatedly made. We note that failing to calculate the outside speedy trial date is risky for the court. In this case, we were able to make these calculations from the record.

acknowledge the court's finding that Howard did not object to a continuance, and mischaracterizes the days excluded from the speedy trial calculation. After calculating the dates ourselves, we disagree with his math.

CrR 3.3 is the court rule that provides for enforcement of a defendant's right to a speedy trial. *State v. Kenyon*, 167 Wn.2d 130, 136, 216 P.3d 1024 (2009). We review the application of CrR 3.3 to a particular set of facts de novo. *Id.* at 135. CrR 3.3(b)(1) requires detained defendants be brought to trial within 60 days of the "commencement date," which is generally the arraignment. CrR 3.3(c)(1). "If a defendant is released from jail before the 60-day time limit has expired, the limit shall be extended to 90 days." CrR 3.3(b)(3).

Certain time periods are excluded from the speedy trial calculation. CrR 3.3(e). Continuances granted upon written agreement of the parties are excluded from the calculation. CrR(e)(3), (f). Continuances granted on a motion of the court or a party are also excluded when such a continuance "is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2). But docket congestion is not good cause for delaying a trial beyond the time required by CrR 3.3 unless the court "carefully makes a record of the unavailability of judges and courtrooms and of the availability of judges pro tempore." *Kenyon*, 167 Wn.2d at 137. "A defendant waives the right to assert a time-for-trial violation by failing

to object within 10 days after receiving notice of a trial date." *State v. George*, 160

Wn.2d 727, 733, 158 P.3d 1169 (2007).

Howard's arraignment occurred on February 9, 2021. Because he was in custody at the time, his outside date (the last day of his speedy trial period) ended on April 10. His initial trial was set for April 5, 55 days after his arraignment.

When the State was granted a good cause continuance to April 19, speedy trial was tolled for 14 days (April 5 to April 19), setting the outside date to April 24. When Howard was released from jail, 30 days were added to his speedy trial period, extending it to May 24. Howard was granted two good cause continuances, moving the trial to July 6, tolling speedy trial for 78 days and extending the outside date to August 10.

On July 6, the court indicated that it did not have a judge available and would need to continue the trial for one week. The court acknowledged that court congestion is not good cause for a continuance and did not toll the speedy calculation for this one-week continuance. However, when the State indicated its witnesses were unavailable on the proposed new trial date, the court set the trial out another two weeks and found good cause to toll the speedy trial period for 14 days, setting the outside date on speedy trial to August 24.

On July 26, the day of trial, the court again continued the trial for one week due to congestion without excluding this period from Howard's speedy trial period. When the State indicated its witnesses were unavailable and the prosecutor had a scheduled

vacation, the court set trial on August 23, tolling speedy trial for 21 days and setting the outside date to September 14. Trial eventually began on September 1.

On appeal, Howard contends that the trial court erred in finding good cause for the continuance from July 6 to July 26 and tolling speedy trial for that entire time. This argument misapprehends the record. The court found good cause and tolled speedy trial for 14 of the 21 days. Howard also contends that he objected to this continuance, thus preserving the issue. But the trial court specifically found that Howard did not object. Howard does not assign error to this finding or acknowledge it in his briefing.[3] Because Howard did not object to the court's finding of good cause, he waived his right to challenge it on appeal. CrRLJ 3.3(d)(3).[4]

Even if the additional 14 days were included in the speedy trial calculations, the trial would be timely. When trial began on September 1, there were 14 days left in his speedy trial period. While Howard contends that his trial occurred on day 92 of his speedy trial period, he fails to demonstrate or explain how he reaches this conclusion.

---

[3] In his assignment of errors, Howard generally avers that the trial court miscalculated Howard's time-for-trial in violation of CrR 3.3 without challenging any of the court's specific findings. *See* RAP 10.3(g).

[4] Since Howard did not object, we do not decide whether witness unavailability that is caused by court congestion is good cause for excluding time from the speedy trial period.

Howard has failed to explain how he reached his conclusion that the trial date was outside speedy trial, and we determine that his trial date did not violate the CrR 3.3 time for trial rule.

2.       EXPERT TESTIMONY BY SANE NURSE

Howard argues that there was an insufficient foundation for the nurse's testimony as an expert, that her testimony was not helpful to the jury, and that it was more prejudicial than probative. As a result, he claims that the trial court abused its discretion in admitting her testimony under ER 702. We disagree.

We review a trial court's decision to admit expert testimony for a clear abuse of discretion. *State v. Arndt*, 194 Wn.2d 784, 799, 453 P.3d 696 (2019). A trial court abuses its discretion where its exercise of discretion is "'manifestly unreasonable or based upon untenable grounds or reasons.'" *State v. Darden*, 145 Wn.2d 612, 619, 41 P.3d 1189 (2002) (quoting *State v. Powell*, 126 Wn.2d 244, 258, 893 P.2d 615 (1995)). "Specifically, an abuse of discretion can be found when the trial court 'relies on unsupported facts, takes a view that no reasonable person would take, applies the wrong legal standard, or bases its ruling on an erroneous view of the law.'" *Arndt*, 194 Wn.2d at 799 (quoting *State v. Lord*, 161 Wn.2d 276, 284, 165 P.3d 1251 (2007)).

ER 702 governs the admissibility of expert testimony. The rule states:

>       If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a

12

witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Determining admissibility of expert testimony requires consideration of two factors: "(1) does the witness qualify as an expert; and (2) would the witness's testimony be helpful to the trier of fact." *State v. Guilliot*, 106 Wn. App. 355, 363, 22 P.3d 1266 (2001). Howard challenges the second factor.

Evidence is helpful to the trier of fact where "'testimony concerns matters beyond the common knowledge of the average layperson, and does not mislead the jury to the prejudice of the opposing party.'" *Id*. at 363 (internal quotation marks omitted) (quoting *State v. Farr-Lenzini*, 93 Wn. App. 453, 461, 970 P.2d 313 (1999)). "'Courts generally interpret possible helpfulness to the trier of fact broadly and will favor admissibility in doubtful cases.'" *State v. Groth*, 163 Wn. App. 548, 564, 261 P.3d 183 (2011) (internal quotation marks omitted) (quoting *Moore v. Hagge*, 158 Wn. App. 137, 155, 241 P.3d 787 (2010)).

Howard raises several challenges to the nurse's testimony. He contends that the nurse's testimony was not helpful because the nurse did not examine the victim in this case and only provided generalized testimony on the definitions of strangulations and possible manifestations of strangulation. Howard argues that a lay juror would be able to understand strangulation from the legal definition included in the jury instructions.

Here, the trial court did not abuse its discretion in finding that the SANE nurse's

testimony on strangulation was helpful. She testified that visible signs of strangulation

occur in only about 50 percent of cases and that bruising marks from strangulation may

not appear immediately. This testimony was helpful to the jury because it was asked to

determine whether Howard "intentionally assaulted Dusti Jones by strangulation." CP at

272. Evidence was presented that the only initial visible injury to Jones' neck was a

scratch but this later turned into bruising. The nurse's testimony tended to show that the

bruising could have been caused by the strangulation even though it did not immediately

appear. Without this testimony, the jury might not have been able to connect the bruising

to the strangulation.

The nurse additionally explained that a relatively small amount of pressure was

required to stop airflow and blood flow during a strangulation. The jury instructions

defined strangulation as "to compress a person's neck, thereby obstructing the person's

blood flow or ability to breathe, or doing so with the intent to obstruct the person's blood

flow or ability to breathe." CP at 274. The nurse's explanation was helpful to the jury

because it informed the jury's determination of whether Howard's compression of Jones'

neck obstructed or intended to obstruct blood flow or her ability to breathe.

Howard suggests that the nurse's testimony was improper because she did not

examine the victim in this case or offer an opinion on whether this particular victim was

strangled. However, an expert may testify about their area of expertise "in the form of an

14

opinion *or otherwise*." ER 702 (emphasis added). The rule allows, but does not require, opinion testimony.

Howard implies several additional arguments regarding the nurse's testimony that are not developed or analyzed and we decline to consider them. Howard asserts that the SANE nurse was not qualified to provide testimony on strangulation generally, but other than providing a large block quote of the nurse's testimony, he fails to provide any analysis or application. Howard claims that the nurse's testimony was "an imprimatur on witness credibility" but fails to further explain this allegation. Br. of Appellant at 23. He claims that the nurse's testimony "delved into the spheres of statistical analysis and areas of comparison far outside of her ability as a SANE professional" but fails to cite to any specific portion of the nurse's testimony. Br. of Appellant at 25.

Howard also broadly asserts that admission of the nurse's testimony violated ER 403. However, apart from citing to ER 403, he fails to provide legal citation or analysis in support of his argument. Additionally, Howard claims that the State's closing argument was improper because it relied on the nurse's testimony, and in doing so, "conveyed substantially more than what is reflected by the record." Br. of Appellant at 28. Howard does not provide any legal support or analysis for this contention. Finally, Howard appears to claim that the expert witness jury instruction was "adverse to his case" because the nurse did not provide an expert opinion and her testimony was

15

questionable but does not provide analysis or legal support for this argument. Br. of Appellant at 27.

These arguments lack proper citation to the record, legal authority, or are unsupported by legal argument. *See* RAP 10.3(a); *Regan v. McLachlan*, 163 Wn. App. 171, 178, 257 P.3d 1122 (2011) ("We will not address issues raised without proper citation to legal authority."); *State v. Stubbs*, 144 Wn. App. 644, 652, 184 P.3d 660 (2008) ("Passing treatment of an issue or lack of reasoned argument is insufficient to allow for our meaningful review."), *rev'd on other grounds*, 170 Wn.2d 117, 240 P.3d 143 (2010); *In re Disciplinary Proc. of Whitney*, 155 Wn.2d 451, 467, 120 P.3d 550 (2005) (citing *In re Estate of Lint*, 135 Wn.2d 518, 532, 957 P.2d 755 (1998)) (declining to scour the record and construct arguments for counsel). Accordingly, we decline to address them and determine that the trial court did not abuse its discretion in admitting the nurse's expert testimony on strangulation.

3.    HEARSAY STATEMENTS

Howard contends the trial court abused its discretion by admitting various hearsay under exceptions for present sense impression, excited utterance, and medical diagnosis. The State argues that Howard failed to assign error to the court's findings and conclusions on hearsay and the trial court did not otherwise err in admitting the statements.

*Additional Background*

Some of the challenged statements were made shortly after Howard assaulted

Jones. While Donald Richardson was on the phone with Dusti Jones, he heard her

scream and the phone went dead. Richardson immediately called 911 and the State

moved to introduce the recorded call to 911. While he was still on the phone with the

dispatcher, Richardson found Jones. Richardson and Jones continued to provide

information to the 911 dispatcher about their location and the events. Richardson would

relay questions and answers between the 911 dispatcher and Jones.

Soon thereafter, Richardson and Jones met up with Officer Wilkes. The

conversation between Richardson, Jones, and Officer Wilke was recorded on Officer

Wilke's body camera. Richardson told Officer Wilke that they had circled the block

because they were afraid Howard would return. Jones described her confrontation with

Howard as occurring over the last several hours, culminating in Howard's assault of

Jones while she was on the phone with Richardson.

Following a pre-trial evidentiary hearing, the court entered findings of fact to

support its conclusion that some of the recorded conversations were admissible. Relevant

to this appeal, the court held that statements made by Richardson and Jones during the

initial 911 call were admissible under the hearsay exception for excited utterance, ER

803(a)(2), and present sense impression, ER 803(a)(1). The court also held that initial

statements made by Jones to Officer Wilkes, that were recorded on his body camera,

were admissible under the hearsay exception for excited utterance. Likewise, initial

statements made by Richardson to Officer Wilke were admissible as both excited

utterances and present sense impressions. The court held that statements made by Jones

during the later part of her contact with law enforcement were not admissible.

*Sufficiency of Appellate Challenge*

We initially address Howard's failure to assign error to the trial court's findings

and conclusions. In his assignment of errors, Howard broadly asserts that the court's

findings of fact and conclusions of law "are not sufficiently specific so as to meet the

criteria" for each of the hearsay exceptions. Br. of Appellant at 1. In his briefing,

Howard contends that the court's findings and conclusions fail to specify any single

statement made by either Richardson or Jones. Howard goes on to contend that he is

assigning error "to each and every finding of fact, as well as each and every conclusion of

law." Br. of Appellant at 32.

Appellants are required to separately assign error to each finding of fact they

contend was improperly made, including reference to the specific finding by number.

RAP 10.3(g), 10.4(c). Howard's blanket assignment of error does not comply with this

rule of appellate procedure. And though Howard maintains that the court's findings are

generally inadequate, he fails to provide any meaningful analysis as to what level of

specificity is required and how the court's findings in this case failed to meet the

standard. In other words, his generalized complaint about the trial court's generalized

18

findings fails to sufficiently brief the issue and we decline to consider whether the court's

findings were generally inadequate. *See* RAP 10.3(a)(6); *State v. Rafay*, 168 Wn. App.

734, 843, 285 P.3d 83 (2012) (issues presented without meaningful analysis need not be

considered).[5]

*Standard of Review*

Howard goes on to challenge findings of fact 1, 2, 3, 4, 6, 7, 8, and 9 within his

briefing. We review evidentiary rulings for abuse of discretion. *State v. Magers*, 164

Wn.2d 174, 187, 189 P.3d 126 (2008). A trial court abuses its discretion where its

exercise of discretion is "'manifestly unreasonable or based upon untenable grounds or

reasons.'" *Darden*, 145 Wn.2d at 619 (quoting *Powell*, 126 Wn.2d at 258).

"Specifically, an abuse of discretion can be found when the trial court 'relies on

unsupported facts, takes a view that no reasonable person would take, applies the wrong

legal standard, or bases its ruling on an erroneous view of the law.'" *Arndt*, 194 Wn.2d

at 799 (quoting *Lord*, 161 Wn.2d at 284).

We review challenged findings to determine if they are supported by substantial

evidence. *State v. Stewart*, 12 Wn. App. 2d 236, 240, 457 P.3d 1213 (2020).

"Substantial evidence exists where there is a sufficient quantity of evidence in the record

---

[5] Regardless, we note that the court's written findings are supplemented by its oral decision delivered at the conclusion of the hearing.

to persuade a fair-minded, rational person of the truth of the finding." *State v. Hill*, 123 Wn.2d 641, 644, 870 P.2d 313 (1994).

*Recorded Statements Made During the 911 Call*

Howard challenges the trial court's admission of statements made by Richardson and Jones during the 911 call. The trial court found that both Richardson and Jones were under the stress of excitement from Howard's attack on Jones when they relayed the attack and their location to the 911 dispatcher. The court concluded that statements made by Jones and Richardson during the 911 call were admissible as excited utterance and alternatively as present sense impressions. CP at 163-64.

While Howard challenges the court's admission of statements made to the 911 dispatcher under the present sense impression exception, he fails to challenge the court's alternative ground for admitting the same statements as excited utterances. Because he fails to address this alternative ground for admission, we decline to address whether application of the present sense impression exception to these statements was an abuse of discretion. *See State v. St. Pierre*, 111 Wn.2d 105, 119, 759 P.2d 383 (1988) (trial court's ruling on the admissibility of evidence will not be disturbed if it is sustainable on an alternate ground), *abrogated on other grounds by Crawford v. Washington*, 541 U.S. 36, 60, 124 U.S. 1354, 158 L. Ed. 2d 177 (2004).

The only argument regarding the statements made to the 911 operator actually argued in Howard's brief is that Jones's statements, which were sometimes repeated by

Richardson, were testimonial. Whether a statement is testimonial is only an issue when

admitted statements are challenged under the confrontation clause. *See Davis v.*

*Washington*, 547 U.S. 813, 821, 126 S. Ct. 2266, 165 L. Ed. 2d 224 (2006). Here,

Richardson and Davis both testified at trial so confrontation was not an issue. Whether

statements are testimonial is not part of the analysis for an excited utterance.[6]

*Statements made to Officer Wilke*

Howard also challenges the trial court's admission of initial statements made by

Richardson and Jones to Officer Wilke and recorded on his body camera. We conclude

that the trial court's findings are supported by substantial evidence and likewise support

the court's conclusion that the statements qualified as excited utterance under ER

803(a)(2).[7]

A statement generally excluded as hearsay may be admitted if it qualifies as an

excited utterance. The rule defines an excited utterance as "[a] statement relating to a

startling event or condition made while the declaration was under the stress of excitement

caused by the event or condition." ER 803(a)(2). The proponent of evidence under this

exception has the burden of showing that a startling event occurred, the proffered

---

[6] Presumably the trial court made findings on whether statements were testimonial because it was not clear if Jones would be testifying at trial.

[7] Because the trial court did not abuse its discretion by admitting the statements under the excited utterance exception, we decline to consider the alternate ground of admission under the present sense impression exception.

statements were made while the declarant was under the stress of the event, and the statements relate to the event. *State v. Woods*, 143 Wn.2d 561, 597, 23 P.3d 1046 (2001). "Often, the key determination is whether the statement was made while the declarant was still under the influence of the event to the extent that the statement could not be the result of fabrication, intervening actions, or the exercise of choice or judgment." Id.

While acknowledging that a startling event occurred, Howard challenges the trial court's finding that Richardson and Jones were still under the stress of this event when they contacted Officer Wilke. With respect to Richardson, however, Howard fails to set forth any argument as to why the court's finding was unsupported. Accordingly, we decline to address this issue. *See Stubbs*, 144 Wn. App. at 652.

With respect to the statements made by Jones to Officer Wilke, Howard contends that substantial evidence does not support the court's finding that Jones was under the stress of excitement from event when she made the statements. We disagree. At the hearing, Officer Wilke testified that he had met up with Jones and Richardson in a parking lot following Richardson's 911 call. This occurred approximately 19 minutes after Howard's attack on Jones. Jones and Richardson arrived in a van. Jones exited the vehicle and walked over to Officer Wilke. Officer Wilke asked Jones what had been going on, and she responded that "he," presumably Howard, had "surprisingly" shown up at her house from Tacoma. RP (Apr. 5, 2021) at 75Officer Wilke testified that Jones seemed a little shaken up but was calm and composed for the most part. He also noted

22

that she expressed concern about getting her truck back multiple times throughout their conversation.

The State also played the bodycam footage for the trial court. At the beginning of the video, Richardson pulls up to Officer Wilke with Jones in the passenger seat. Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec. Richardson told Officer Wilke that they had circled the block because they had been afraid Howard would return. Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec. Although Jones had mud on her as well as sticks and leaves in her hair, she appeared relatively calm in the video. Wilke Bodycam 8:10-8:15, 9:14-9:36. Jones told Officer Wilke that her and Howard were in the process of getting a divorce and he wanted to "rekindle" things but she did not want to reconcile. She also said Howard had asked her about who she had been dating and then took the keys to her truck and told her if she wanted her truck back, she could find it at the bus station. Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec. Jones explained that she walked to the bus station to get her truck, but then Howard told her that if she wanted her truck back it would be in Tacoma. Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec.

After explaining her ongoing encounters with Howard that day, Jones then recounted the recent attack. Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec. She said that after Howard told her she could find her truck in Tacoma, she started walking back home and was talking on the phone with Richardson. Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec. While Jones was walking next to a field, Howard jumped out at her and

tried to choke her.  Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec.  Jones appeared to

tear up when she explained this.  Wilke Bodycam 4 min., 2 sec. to 6 min., 31 sec.

This evidence is sufficient to support the trial court's finding that Jones was under

the stress of the event at the time she spoke with Officer Wilke.  In support of his

argument to the contrary, Howard contends that the initial confrontation between Howard

and Jones started two hours prior, that Jones was not "screaming" when she met with

Officer Wilke, and that her main concern seemed to be recovering her vehicle.  Although

the confrontation between Howard and Jones had been continuing throughout the day, the

last startling event was Howard's assault on Jones within the last 30 minutes.  Ultimately,

the trial court considered all of the evidence and on balance found that it supported a

finding that Jones was under the stress of the assault when she initially spoke to Officer

Wilke.  This decision was within the trial court's discretion.

*Medical Records Hearsay Exception*

Howard also argues that the trial court abused its discretion in admitting a prior

statement from Jones under the medical records exception.  Specifically, Howard is

referring to the trial court's decision to allow Dr. Hartley to read from Jones' medical

records: "Patient states that she does have some neck pain and ligature marks from her

husband's hands."  1 RP at 310.

The medical records exception to the hearsay rule applies to statements

"reasonably pertinent to diagnosis or treatment."  ER 803(a)(4).  The medical records

24

exception generally does not allow admission of statements attributing fault.  *State v.*

*Redmond*, 150 Wn.2d 489, 496, 78 P.3d 1001 (2003).  However, in cases of domestic

violence, "a declarant's statement disclosing the identity of a closely-related perpetrator

is admissible under ER 803(a)(4) because part of reasonable treatment and therapy is to

prevent recurrence and future injury."  *State v. Williams*, 137 Wn. App. 736, 746, 154

P.3d 322 (2007).

Here, this was a domestic violence case.  Jones was in the process of separating

and divorcing from Howard when he assaulted her.  The State alleged, and the jury found

that Howard and Jones were intimate partners.  Because it was a domestic violence case,

Jones' statement that the marks on her neck were from Howard's hands were within the

medical records exception because part of the treatment was to prevent future injury.

Accordingly, the trial court did not abuse its discretion in admitting the statement under

the medical records exception.

Additional Argument

Although it is not mentioned in the assignments of error, Howard also appears to

argue, in the hearsay argument section of his brief, that the State should not have been

permitted to call Jones as a witness given that she did not appear until the middle of the

trial.  He claims that doing so resulted in introduction of domestic violence forms that

were prejudicial to his case.  Howard argues that Jones' testimony should have been

excluded under the factors set forward in *Barci v. Intalco Aluminum Corp.*, 11 Wn. App

342, 522 P.2d 1159 (1974). The State points out that the forms were only admitted because Howard used them to cross-examine Jones at trial, and the court ruled that by doing so, Howard opened the door to their admission. Because Howard does not assign error to this evidentiary ruling, we decline to consider it.

In sum, the trial court did not abuse its discretion by admitting statements under the hearsay exceptions for excited utterance and medical records.

4.      PROSECUTORIAL MISCONDUCT

Howard argues that the State committed misconducted by improperly vouching for Jones' credibility during its closing argument. We disagree.

"'In order to establish prosecutorial misconduct, a defendant must show that the prosecutor's conduct was both improper and prejudicial in the context of the entire record and the circumstances at trial.'" *State v. Slater*, 197 Wn.2d 660, 681, 486 P.3d 873 (2021) (internal quotation marks omitted) (quoting *Magers*, 164 Wn.2d at 191). The burden for proving prosecutorial misconduct is on the defendant. The defendant must demonstrate not only that the conduct was improper but also that it was prejudicial. *Id*.

A prosecutor commits misconduct when they personally vouch for a witness' credibility. *State v. Warren*, 165 Wn.2d 17, 30, 195 P.3d 940 (2008). "Improper vouching generally occurs (1) if the prosecutor expresses his or her personal belief as to the veracity of the witness or (2) if the prosecutor indicates that evidence not presented at trial supports the witness's testimony." *State v. Ish*, 170 Wn.2d 189, 196, 241 P.3d 389

26

(2010). However, a prosecutor "has wide latitude in closing argument to draw reasonable inferences from the evidence and may freely comment on witness credibility based on the evidence." *State v. Lewis*, 156 Wn. App. 230, 240, 233 P.3d 891 (2010).

On appeal, Howard argues the State committed misconduct during closing argument by personally vouching for Jones' credibility. Specifically, Howard points to the State's argument regarding Jones' statements to her doctor:

> Now, a person tells their doctor the truth, ladies and gentlemen. When they go to the doctor, it's important to tell the doctor what really happened so the doctor or the medical people can provide the best possible treatment. That's why it's allowed to be presented to the jury, because it has that extra credibility that you're not going to go in and tell your doctor something that's inaccurate. That's why Officer—Dr. Hartley was able to come in and repeat what was said.

2 RP at 787-88.

Howard appears to be arguing that the use of the word "truth" constituted improper vouching. However, the mere use of the word "truth" when referring to a witnesses testimony does not necessarily result in improper vouching. *Warren*, 165 Wn.2d at 30. Rather, a defendant must show that argument was improperly based on evidence not presented at trial or on the State's personal opinion. *Warren*, 165 Wn.2d at 30.

The State argued that Jones' statement to her doctor was credible because she had a motive to be truthful—to ensure she received the best possible treatment. The State

27

explained this and explained to the jury why the testimony regarding Jones' statement to her doctor was permitted. In doing so, it did not offer a personal opinion or rely on facts not in evidence. Thus, Howard fails to meet his burden of showing the prosecutor was improperly vouching for the testimony of a witness and fails to show prosecutorial misconduct.[8]

5.      STATEMENT OF ADDITIONAL GROUNDS

Howard raises several additional claims in his statement of additional grounds. We disagree with each of Howard's arguments.

Confrontation Clause

Howard argues that his confrontation clause rights were violated by the admission of the 911 calls, the bodycam footage, and the limited scope of the State's questioning of Jones.

---

[8] Howard also argues that the State's arguments, when considered with statements made by the trial court during the nurse's testimony explaining that the nurse was permitted to testify as an expert, highlighted the unfairness of the State's actions. However, Howard fails to argue that there was any error in the trial court's statements or provide legal support for his apparent allegation that the statements were improper. Howard also states that Richardson showed contempt toward Howard during his testimony but similarly fails to explain the error or provide legal support for any argument. Accordingly, we decline to address these arguments. *See* RAP 10.3(a); *Regan*, 163 Wn. App. at 178; *Stubbs*, 144 Wn. App. at 652.

Under the Sixth Amendment, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." *State v. Davis*, 154 Wn.2d 291, 298, 111 P.3d 844 (2005). "[W]hen a witness is asked questions about the events at issue and about his or her prior statements, but answers that he or she is unable to remember the charged events or the prior statements, this provides the defendant sufficient opportunity for cross-examination to satisfy the confrontation clause." *State v. Price*, 158 Wn.2d 630, 650, 146 P.3d 1183 (2006).

We review constitutional issues de novo. *Id.* at 638-39. However, confrontation clause issues may not be raised for the first time on appeal. *State v. Burns*, 193 Wn.2d 190, 210-11, 438 P.3d 1183 (2019).

To the extent Howard is assigning error under the confrontation clause to the admission of the 911 calls and bodycam footage because Jones was not initially going to testify at trial, the issue has been preserved. However, because Jones actually ended up testifying, there was no confrontation clause issue. *See Price*, 158 Wn.2d at 650. This is true even though she testified that she did not remember the incident. Thus, we disagree with this argument.[9]

---

[9] Howard cites to several cases in support of his position. However, none of the cases he relies on support his position that, contrary to *Price*, 158 Wn.2d 630, the fact that Jones testimony that she did not remember the incident violated Howard's confrontation clause rights.

To the extent Howard is assigning error to the scope of the State's questions to Jones, arguing that the State's failure to ask her specific questions about the incident limited his ability to cross-examine her in violation of the confrontation clause, that issue has not been preserved for appeal. The scope of the State's direct examination of Jones was not objected to below and therefore cannot be raised on appeal. Accordingly, we decline to address this argument. RAP 2.5(a).

Insufficient Evidence

Howard argues the State failed to present evidence of intent and substantial bodily harm.[10] He also appears to argue that the jury instructions were insufficient because the jury was only required to find two elements to convict Howard of second degree assault; suggesting that the State was required to also prove substantial bodily harm.

Howard was charged with second degree assault under RCW 9A.36.021(1)(g), which prohibits one from assaulting another by strangulation or suffocation. The statute does not require the State to prove substantial bodily harm.

The evidence was also sufficient to show intent. The evidence showed that Howard had pushed Jones to the ground and put his hands around her neck. These statements were circumstantial evidence of intent because they showed Howard acted in a

---

[10] To the extent Howard also argues the jury should have been instructed on a lesser included offense, that argument has been waived because he did not request it below. *See* RAP 2.5(a).

30

manner that was likely to cause strangulation and a jury would understand was likely to cause strangulation. Thus, we disagree with Howard's arguments regarding the sufficiency of the evidence.

Photo Exhibits

Howard argues that several of the photos of Jones' injuries should not have been admitted because they were not properly authenticated, were hearsay, and violated the best evidence rule.

"Authentication is a threshold requirement designed to assure that evidence is what it purports to be." *State v. Payne*, 117 Wn. App. 99, 106, 69 P.3d 889 (2003). Under ER 901(a)(1), a photograph can be authenticated by testimony that the picture is a true and accurate depiction of the subject matter on the date of the picture. *State v. Sapp*, 182 Wn. App. 910, 914, 332 P.3d 1058 (2014). The person does not have to be the photographer of the picture so long as the witness has first-hand knowledge of the subject matter. *Id*.

Richardson testified he had known Jones and had been friends with her for about nine years. The State presented Richardson with a series of photos, and he testified that he recognized the photos as photos of Jones' neck following the incident because he recognized her clothing in the photos. Richardson also testified that the photos were consistent with what he saw after contacting Jones following the incident. The trial court

did not abuse its discretion in finding that Richardson's testimony was sufficient to authenticate the photographs.

Next, Howard argues that the exhibits should have been excluded as hearsay. Hearsay is an out of court statement offered to prove the truth of the matter asserted. ER 801(c). "A 'statement' is (1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." ER 801(a). Photos generally are not statements and are therefore not hearsay. Here, although the photos are not a part of the record before us, Howard describes the photos he is referring to simply as photos of Jones' injuries.[11] He fails to address how these photographs are assertions or would be excluded under the hearsay rule. Accordingly, we determine that Howard's hearsay argument fails.

Finally, Howard contends that the photographs violate the best evidence rule, which states,

> To prove the content of a writing, recording, or photograph, the original writing, recording, or photograph is required, except as otherwise provided in these rules or by rules adopted by the Supreme Court of this state or by statute.

ER 1002. Howard's argument fails to recognize that duplicates of originals are admissible to the same extent as an original unless "(1) a genuine question is raised as to

---

[11] It appears that Howard attached the photos in question to his statement of additional grounds. However, they are not officially a part of the record before this court.

32

the authenticity of the original or (2) in the circumstances it would be unfair to admit the

duplicate in lieu of the original." ER 1003. Nothing in the record indicates a genuine

concern as to the authenticity of the originals or that it was unfair to admit the duplicate

in lieu of the original. Accordingly, this argument fails.

*Evidence of Prior Misconduct*

Howard argues that the trial court erred in admitting evidence of prior misconduct.

We determine that any error in admitting this evidence was harmless. During direct

examination, Howard testified that as he approached Jones on the sidewalk, she was on

the phone talking to Richardson about Howard. Howard said he reached for Jones'

phone to tell Richardson what was really happening. This caused Jones to have a "jerk

reaction" to keep him from grabbing her phone and Howard testified that they both

slipped and fell to the ground. On cross-examination, Howard testified that Jones' jerk

reaction was caused by "some things" in her past, however, he denied that it had anything

to do with him. 2 RP at 703. When asked if, during the investigation, Howard had told

an officer that he (Howard) had grabbed Jones' phone in the past, Howard objected.

The court initially sustained Howard's objection, but the State argued that it

needed to set up the impeachment so it could call the officer back to the stand as a

rebuttal witness. Howard continued to object, based on hearsay, prior bad acts,

relevance, and violating the order in limine. The State argued that Howard opened the

door when he testified on direct examination that Jones' reaction was caused by events in

33

her past. The court agreed and allowed the State to ask Howard about his prior statement to the officer. In response, Howard testified that he had grabbed his wife's phone, but not from her.

Without analyzing whether the trial court abused its discretion by allowing this line of questioning, we determine that any error was harmless. ER 404(b) states that evidence of prior bad acts are not admissible "to show action in conformity therewith." Howard's prior bad acts claim falls under ER 404(b), and is analyzed under the nonconstitutional harmless error standard. "The nonconstitutional harmless error test requires the defendant to show a reasonable probability that the error materially affected the outcome of the trial." *State v. Jennings*, 14 Wn. App. 2d 779, 792, 474 P.3d 599 (2020), *vacated in part on other grounds*, 199 Wn.2d 53, 502 P.3d 1255 (2022).

The testimony that Howard had previously tried to grab Jones' phone from her was not directly related to a material issue in the case. It had no direct bearing on whether Howard committed the assault. Instead, it was related to why Jones may have reacted strongly when Howard attempted to grab her phone—a tangential issue. Because the testimony was related to a tangential issue, it is unlikely that it was the basis for the jury's verdict. Therefore, there is not a reasonable probability that any error in the evidentiary ruling materially affected the outcome of the case. Thus, we find that any error in admitting it was harmless.

Howard also claims that Richardson's 911 call should have been excluded under ER 404(b) because Richardson made several negative statements regarding Howard during the call. However, under the "'same transaction' exception to ER 404(b), evidence of other crimes or bad acts is admissible to complete the story of a crime or to provide the immediate context for events close in both time and place to the charged crime." *Lillard*, 122 Wn. App. at 432. Because Richardson's 911 call was concurrent with Howard's assault of Jones, it fits into the same transaction exception, and therefore the trial court did not abuse its discretion in admitting it.

Right to Jury of Peers

Howard argues that his Sixth Amendment right to be tried by a jury of his peers was violated because there were no black people in the jury pool. We initially stayed our opinion in this case because the Supreme Court was deciding a similar issue in *State v. Rivers*, 1 Wn.3d 834, 533 P.3d 410 (2023).

Criminal defendants are entitled to a trial by an impartial jury under the Sixth Amendment, and this includes a right to have their jury drawn from "a fair cross section of the community." *Id.* at 851. In order to show a fair cross section violation, a defendant must show: "(1) a distinctive group (2) is unreasonably underrepresented in his own venire and in jury venires generally, (3) as a result of systematic exclusion in the jury selection process." *Id*.

In *Rivers*, the defendant argued two theories to meet his burden of showing the underrepresentation of black people in the jury pool resulted from systemic exclusions. First, he argued "that low juror response rates combined with King County's summons practices produce an 'oversampling' of predominantly white zip codes and an 'undersampling' of more diverse zip codes." *Id*. at 864-65.  The court found this argument failed because Rivers did not show that the low response rate was due to systemic factors. *Id*. at 865.  Rivers' second theory was that the division of King County into two demographically disparate jury districts was the result of historically racist housing policies. *Id*.  While acknowledging that this theory could support a claim of systemic exclusion, the Court rejected the argument because Rivers failed to prove the theory with actual evidence. *Id*. at 866.

Likewise, in this case, Howard raised an objection to the racial makeup of the jury, but failed to articulate any theories or produce any evidence on the reason for the alleged underrepresentation.  During voir dire, Howard motioned to strike the entire jury panel because of a lack of minorities and because there were no black people in the jury pool. He argued that the lack of minorities on the jury panel violated his constitutional right to be tried by a jury of his peers.  Following a lengthy discussion between Howard, the State, and the trial court, the trial court denied Howard's motion determining that there was no systematic exclusion.  On appeal, Howard reiterates his argument but fails to meet his burden of showing that the underrepresentation was due to systemic exclusions.  A

venire containing no apparent black potential jurors does not on its own violate a

defendant's right to a jury of his peers.  *Id.* at 851-52.

Miscellaneous Arguments

Howard claims that he was prejudiced by the nurse's testimony because she used

the word "strangulation" more than 30 times.  "Although relevant, evidence may be

excluded if its probative value is substantially outweighed by the danger of unfair

prejudice, confusion of the issues, or misleading the jury, or by considerations of undue

delay, waste of time, or needless presentation of cumulative evidence."  ER 403.  We

review evidentiary decisions for an abuse of discretion.  *Lillard*, 122 Wn. App. at 431.

As explained above, the nurse's expert testimony regarding strangulation was

probative because it informed the jury as to the force required to strangle a person.

Additionally, the simple use of the word "strangulation" on its own was not unfairly

prejudicial to Howard, especially where the State was required to establish strangulation.

Accordingly, we disagree with this argument.

Howard claims that the State argued that the assault by Howard was premeditated

but failed to present evidence to support this claim.  Howard appears to be referring to the

portion of the State's closing argument where it said that Howard's attack was

premeditated because he followed Jones and waited until she was in a field to attack her.

As the State indicated in its argument, the evidence that Howard followed Jones and

waited until she was in a more isolated area to attack her supports premeditation.

Regardless, premeditation is not an element of the crime that the State had to prove.

Accordingly, this argument fails.

Howard also argues that the police failed to investigate the location where he

assaulted Jones and instead improperly relied on photos taken by Richardson. It is not

evident what legal issue these allegations raise. Therefore, we decline to address this

issue because Howard fails to "inform the court of the nature and occurrence of alleged

errors." RAP 10.10(c).

Howard argues that the trial court improperly allowed Officer Wilke to remain in

the courtroom during the trial. During the CrR 3.5 hearing, at the State's request, the trial

court determined that Officer Wilke would be permitted to remain in the courtroom

during trial as the State's agent. Howard objected to the presence of Officer Wilke, who

is the State's lead investigator, during trial because Officer Wilke was also on the State's

witness list and had been involved in a separate incident regarding Howard. The trial

court overruled Howard's objection, explaining that it was a normal practice for the

State's lead investigator to be present during the case.

We do not disturb a trial court's decision regarding the exclusion of witnesses

absent a manifest abuse of discretion. *State v. Weaver*, 60 Wn.2d 87, 90, 371 P.2d 1006

(1962). "When the exclusionary rule is invoked, it is customary to exempt one witness to confer with the prosecutor during the trial." *Id*. Because Officer Wilke was the State's investigator, the trial court was well within its discretion in permitting him to remain in the courtroom.

Howard makes several arguments that appear to be requests for this court to make credibility determinations. Howard argues that Richardson made false statements. Howard also argues that the testimony of his physical therapist established that he was not physically capable of strangling Jones. Additionally, Howard argues that Officer Canty's testimony that Howard had to be pulled from his vehicle was contradicted by bodycam footage.

"Credibility determinations are reserved for the trier of fact, and an appellate court 'must defer to the [trier of fact] on issues of conflicting testimony, credibility of witnesses, and persuasiveness of the evidence.'" *State v. Rafay*, 168 Wn. App. at 843 (alteration in original) (quoting *State v. Liden*, 138 Wn. App. 110, 117, 156 P.3d 259 (2007)). We decline to review these claims because they are requests for this court to make credibility determinations, which are not within its purview.

In sum, each of the arguments raised in Howard's statement of additional grounds fail.

Affirmed.

A majority of the panel has determined this opinion will not be printed in the Washington Appellate Reports, but it will be filed for public record pursuant to RCW 2.06.040.

_____
Staab, J.

WE CONCUR:

_____
Fearing, J.

_____
Pennell, J.